IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BONNIE MEADOWS, | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-527-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

Plaintiff Bonnie Meadows filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of the final decision of the Commissioner of

Social Security denying her claims for disability insurance benefits under Title II and supplemental

security income (SSI) under Title XVI of the Social Security Act. She applied for SSI on April 23,

2001, and disability insurance benefits on May 10, 2001, alleging that she has been disabled since

November 3, 1999. After the Social Security Administration denied her applications for benefits

both initially and on reconsideration, Meadows requested a hearing before an administrative law

judge (the "ALJ"). An administrative hearing was held in August 2002 before ALJ R. Neil Lewis,

resulting in an unfavorable decision issued September 10, 2002. (Tr. 355). The Appeals Council, however, vacated that decision and remanded the case for further proceedings. (Tr. 368). ALJ Jack Raines held a second administrative hearing on December 15, 2004, and issued an unfavorable determination on January 7, 2005. (Tr. 556). The Appeals Council also vacated this decision. (Tr. 572). ALJ Raines held a new hearing on May 30, 2007,[1] and issued another unfavorable decision on July 24, 2007, in which he found Meadows capable of performing a modified range of light work activity.[2] (Tr. 20-33). The Appeals Council denied Meadows' request for review, leaving the ALJ's 2007 decision to stand as the final decision of the Commissioner. (Tr. 9).

B.     STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000); *Stone v. Heckler*, 752 F.2d 1099, 1101

---

[1] Meadows was insured for purposes of disability insurance benefits through December 31, 2006. (Tr. 398). Disability must be established on or before that date to establish entitlement to disability insurance benefits. *See generally Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1080 n.1 (5th Cir. 1981). Expiration of her insured status does not affect her claim for SSI, but SSI cannot be paid for the time preceding an application for benefits even if disability began earlier. *See* 20 C.F.R. § 416.335.

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

(5th Cir. 1985). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* §§ 404.1520(e), 416.920(e).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir. 1999).  At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198.

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995);  *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* The court may not reweigh the evidence in the record or substitute its judgment for the Commissioner's, but will scrutinize the record to determine if the evidence is present.  *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383.

C.     ISSUE

    1.     Whether the ALJ properly weighed the medical opinions in the record; and

    2.     Whether the ALJ erred in his analysis of Meadows' work activity after her alleged disability onset date.

D.     ADMINISTRATIVE RECORD

    1.     Claimant History

The administrative record provides the following information about Meadows:

Meadows was born August 14, 1964. (Tr. 98). She has a high school education and work experience as a computer programmer analyst. (Tr. 121, 140). In November 3, 1999, Meadows fell at work, hitting her shoulder and her head. (Tr. 209, 260). Surgeon Joseph Berman, M.D., performed arthroscopic surgery to repair Meadow's left shoulder in January 2000, (Tr. 222), and following surgery, enrolled her in a physical therapy program. (Tr. at 234-59). Berman released Meadows to return to work in June 2000. (Tr. 219).

Meadows attended a consultative examination related to her worker's compensation claim in July 2000. Orthopedic surgeon Page Nelson, M.D., examined Meadows and observed a reduced range of motion in her left shoulder. (Tr. 261). Although Meadows complained of short-term and long-term memory deficits, Nelson noted that Meadows was able to recall events as they discussed her case. Nelson found that Meadows had achieved maximum medical improvement and assigned her a 5% whole-person impairment rating. (Tr. 263). Nelson opined that Meadows should avoid overhead reaching, climbing stairs or ladders, and lifting more than thirty-five pounds. (Tr. 266).

On August 2, 2000, Meadows saw physician Russell Brofer, D.O., for complaints of vertigo, mood swings, memory loss, and decreased attention span that developed after she fell at work. She

was diagnosed with concussion syndrome and vertigo. (Tr. at 199). Brofer ordered additional diagnostic tests and referred Meadows to a neurologist. (Tr. 201).

Neurologist Darryl Camp, M.D., examined Meadows on August 22, 2000. She complained of chronic short-term memory deficits, frequent vertigo, and vascular headaches. (Tr. 272). Camp concurred with the diagnoses of post-concussion syndrome. (Tr. 273). At a follow-up visit in September, Meadows continued to complain of depression and migraines, although medication was helpful. Her dizziness and equilibrium problems had resolved. (Tr. 271).

Meadows attended a neuropsychological examination on October 2, 2000, with Gregg D'Angelo, Ph.D. (Tr. 277). Meadows had recently found a new job, and her hobbies included crafts and computer activities. When asked about her current problems, she complained of memory impairments, blurred vision, language comprehension and use problems, slow reading speed, decreased arithmetic skills, indecisiveness, restlessness, lethargy and decreased libido, poor concentration, anxiety, occasional dizziness or vertigo, and depression due to financial concerns. She also experienced migraines and fits of rage. (Tr. 279).

Meadows was cooperative and pleasant during the interview, but somewhat distracted. D'Angelo found that Meadows was organized and systematic in approaching tasks and she was persistent in her efforts. The results of personality testing were consistent with mild depression and concern about her physical and cognitive functioning. (Tr. 80). Meadows functioned in the average range of intelligence. D'Angelo found Meadows' overall scores were consistent with mild deficits in concentration and information processing secondary to a mild head injury and post-concussion syndrome. (Tr. 281). D'Angelo diagnosed a cognitive disorder and adjustment disorder with depressed mood, and assigned Meadows a current Global Assessment of Functioning (GAF) score

of 60.[3]  (Tr. 282).  D'Angelo recommended neurocognitive rehabilitation to improve Meadows'

concentration and processing of information and to assist her with strategies to improve her

functioning.  (Tr. 281-82).

When she saw her neurologist on February 15, 2001, Meadows reported that her depression

had markedly improved, but her memory loss remained.  She had been referred to the Texas

Rehabilitation Commission for cognitive and memory-skills training, which Camp thought would

be greatly beneficial.  Meadows reported that she was working.  The physical examination was

unremarkable, and Camp advised Meadows to continue with her current treatment regimen and

return in six months for a follow-up appointment.  (Tr. 270).

In May 2001, Meadows complained of increased pain in her left shoulder and left arm. (Tr.

218). A physical examination revealed muscle weakness and sensory changes in the C6 distribution,

and additional tests were ordered to rule out a cervical spine impairment.  Magnetic resonance

imaging (MRI) of her cervical spine was essentially negative.  (Tr. 217-18).

On May 15, 2001, Meadows attended a psychological evaluation with Edward Bleker, Ph.D.

(Tr. 285). She complained of chronic shoulder problems, post-concussion syndrome, migraines, and

vertigo.  After administering a battery of tests, Bleker diagnosed a depressive disorder,  anxiety

disorder, cognitive disorder, and mathematics disorder.  (Tr. 288).  He assigned Meadows a GAF

score of 65.[4]  He also opined that her current cognitive and academic skills were fairly good, but she

did have symptoms consistent with post-concussion syndrome.  Accordingly, he recommended that

---

[3] A GAF score is a standard measurement of an individual's overall functioning level with respect to
psychological, social, and occupational functioning.  American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 32 (4th ed. 1994)(DSM-IV).  A GAF score of 51 to 60 reflects moderate symptoms or
moderate impairment in functioning.  DSM-IV at 34.

[4] A score of 65 reflects mild symptoms.  DSM-IV at 34.

she participate in job training and job placement that avoided situations requiring short-term memory processing, auditory sequential memory, stressful interpersonal or competitive settings, or sustained performance over a considerable period of time where accuracy and speed were emphasized. (Tr. 288).

Meadows underwent a vocational evaluation in May 2001 with Karen Brewer, Ph.D. (Tr. 289). Meadows advised that she had worked in a variety of computer programming positions for twenty years. She had preferred contract positions because the flexible scheduling allowed her to raise her children, but now believed a change in professions was necessary because the effects of her head injury made it difficult to perform the mental demands of a programming job. (Tr. 290).

Brewer administered a battery of tests. Despite Meadow's concentration and headache complaints, she scored mostly within expected levels except for her mathematical ability, which tested at a seventh-grade level. Brewer also observed behavior that suggested that Meadow had more difficulty with higher-level executive functions, decision-making, and complex problem-solving than testing had revealed. (Tr. 291E). Brewer agreed that a cognitive retraining program and some personal counseling would be beneficial. Brewer opined that, with some cognitive enhancement, Meadows might be able to perform less-demanding work in the computer industry. (Tr. 291G). Meadows began a cognitive rehabilitation therapy program with Brewer in November 2001. (Tr. 308-11).

Brewer completed a medical source statement in August 2002 outlining what she thought Meadows could still do in a work setting. (Tr. 331). She found Meadows had a good ability to understand, remember, and carry out very short and simple instructions and to make simple work-

related decisions, and she had fair to good ability to remember work-like procedures.[5]  Brewer also assigned a "fair" rating to Meadows' ability to maintain attention for extended periods of 2-hour segments; maintain regular attendance and punctuality within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others; complete a normal workday and week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without unduly distracting them; respond appropriately to changes in work-setting; and be aware of normal hazards and take appropriate precautions.  (Tr. 331-32). Brewer indicated that these restrictions had persisted since at least November 1999.  (Tr. 333).

Meadows saw neurologist Jacob Rosenstein, M.D., in June 2002 for complaints of neck pain, headaches, nausea, vertigo, memory loss, thoracic pain, shoulder pain, left arm and hand pain, low back pain, and pain in her left buttock, left hip, and left thigh.  (Tr. 322).  Rosenstein diagnosed left cervical radiculopathy,[6] post-concussion syndrome, post traumatic headaches, low back pain, and left lumbar radiculopathy. (Tr. at 324).  Electromyography (EMG) and nerve conduction studies performed October 7, 2002, showed no evidence of cervical radiculopathy.  (Tr. 538).  Rosenstein released Meadows to work in January  2003, with restrictions that she lift no more than twenty pounds, perform no excessive bending, and avoid overhead work.  He also limited her to four hours of work per day with hourly breaks.  (Tr. 487).

---

[5]  The questionnaire defined "good" as some loss in the ability to perform the named activity, but still capable of performing it in regular, competitive employment.  A "fair" ability was defined as a substantial loss in the ability to perform the named activity in regular, competitive employment, and at best, the person could do so only in a sheltered work setting where special considerations and attention were provided.  (Tr. 331).

[6]  Radiculopathy refers to disease of the nerve roots.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1595 (31st ed. 2007).

On May 8, 2003, Meadows saw Rosenstein for a recent exacerbation of cervical and trapezius pain. (Tr. 517). She reported that she was beginning a new job as an administrative secretary. Rosenstein ordered a computed tomography (CT) scan of Meadows' cervical spine, which was interpreted as normal. (Tr. 514). Rosenstein ordered additional diagnostic studies in June 2003 to evaluate the cause of Meadows' continued cervical pain. Nerve conduction velocity studies confirmed bilateral entrapment of the median nerves in her wrist, but the EMG was normal and revealed no radiculopathy. (Tr. 508).

On January 27, 2004, Meadows returned to Rosenstein's office complaining of an exacerbation in her symptoms, especially on the left. She advised that she was currently working from home doing computer programming. (Tr. 487). On examination, Rosenstein observed mild to moderate edema in Meadows' left wrist, tenderness across the trapezial area, and positive trigger points near her thoracic spine. (Tr. 487-88). Meadows saw Rosenstein again on March 15, 2004. She complained of left wrist pain with numbness, tingling, and a decreased grip in that hand. (Tr. 481). Rosenstein diagnosed bilateral carpal tunnel syndrome. (Tr. 482).

Meadows attended a psychological evaluation on September 2, 2004, with Gerald Stephenson, Ph.D. (Tr. 404). Meadows was cooperative and forthcoming during the interview, but cried and acted embarrassed when questioned about her concentration and memory problems. She complained of frequent panic attacks, which began after she fell and hit her head in 1999. (Tr. 405). She advised that she had tried working since her injury, but she had been unable to hold a job because of excessive absences and her attention and memory problems. (Tr. 406).

Meadows was able to complete the tasks assigned to her, but had a panic attack during the testing that interrupted the evaluation. (Tr. 406). Meadows was able to repeat six digits, and she

recalled two of three objects after a three-minute delay and remembered the third when prompted. She was able to name eight of the nine most recent Presidents, and she performed well during concentration and judgment assessments. Her IQ score placed her in the average range of mental ability, and she scored in the average range on reading and arithmetic tests. Personality testing indicated depression and concern about her physical condition. (Tr. 410). Stephenson diagnosed major depressive disorder, panic disorder without agoraphobia, and a pain disorder. He assessed a GAF score of 65, and he assigned a guarded prognosis because Meadows had been in treatment for some time with mediocre results. (Tr. 411).

Stephenson also completed a written assessment of Meadows' work-related mental abilities. He found slight impairment in her ability to understand, remember, and carry out simple instructions. He found moderate impairment in her ability to understand, remember and carry out detailed instructions; make simple work-related judgments; and interact appropriately with the public, supervisors, and co-workers.[7] Stephenson opined that Meadows demonstrated marked impairment in her ability to respond appropriately to work pressures or changes in routine work-setting, which Stephenson attributed to her low tolerance for stress, depression, and short-term memory problems.[8] (Tr. 412-13). He found her capable of managing her own benefits. (Tr. 413).

Meadows continued to see her neurologist on a regular basis in 2004 and 2005. (Tr. 742-69). A 2004 computed tomography scan of her cervical spine was interpreted as essentially normal.

---

[7] "Slight" referred to mild limitation in the named area, but the individual could generally function pretty well, while "Moderate" designated moderate limitation, but the individual was still able to function satisfactorily. (Tr. 412).

[8] "Marked" for purposes of this evaluation meant that the ability to function in that area was seriously limited but not precluded. (Tr. 412).

Rosenstein enrolled Meadows in a chronic pain program in an attempt to wean her from her pain medication.  (Tr. 742).  He opined that she did not have a surgical problem with her neck and instead would benefit from a functional restoration program.  (Tr. 744).

Richard Slaughter, Psy.D., evaluated Meadows in May 2005 to ensure that she was a good candidate for the chronic pain management program.  (Tr. 858).  After examining Meadows, Slaughter opined that Meadows had developed a chronic pain syndrome with depression, anxiety, somatic preoccupation, and pain sensitization. (Tr. at 862).  Although Meadows reported significant difficulties with focus, concentration, attention, and short-term memory, Slaughter found that her actual cognitive deficits were relatively mild.  He considered her an excellent candidate for a multi-disciplinary chronic pain program.  (Tr. 862).

On May 10, 2005, Meadows attended a consultative internal medicine evaluation with William Bosworth, M.D.  (Tr. 697-98).  Meadows estimated that could walk one-fourth of a mile and stand for four or five minutes at a time.  She did some housework, grocery shopping, meal preparation, and laundry, but preferred not to drive because she has panic attacks.  (Tr. 698).  A physical examination was unremarkable.  Bosworth's impression included a history of asthma and chronic bronchitis; chronic back pain; status post surgical repair of the left shoulder; history of transient pedal edema; history of head injury without loss of consciousness; and chronic anxiety and depression.  (Tr. 699).

On May 15, 2005, Meadows underwent an evaluation with clinical psychologist James McCabe, Ph.D.  (Tr. 706).  She reported short-term memory problems, loss of executive functions, and difficulty making decisions.  Her daily routine included arising anytime between 5 a.m. and 2 p.m., and she sometimes stayed up all night.  She spent her time sleeping, watching television,

feeding her cats, or grocery shopping with a friend.  Meadows found it difficult to bathe, prepare meals, clean house, use transportation, read the newspaper, attend church, visit with family or friends, or enjoy leisure activities.  She described herself as unable to cope with laundry, grocery shopping, paying bills, or other daily responsibilities.  (Tr. 707).

On examination, McCabe found Meadows' affect was extremely reactive and labile, with a depressed mood.  (Tr. 707).  McCabe rated Meadow's remote memory as intact and her recent memory as somewhat marginal.  Her immediate memory was in the low-average range. (Tr. 708-09).  McCabe diagnosed a somatoform disorder, depressive disorder, and pain disorder.  He  assigned a GAF score of 45,[9] and opined that Meadows was not capable of managing funds.  (Tr. 709).  He assigned a significantly guarded prognosis. (Tr. 710).

The state agency medical consultants who reviewed the case found Meadows was capable of understanding, remembering and carrying out detailed instructions, making decisions, attending and concentrating for extended periods, accepting instructions, and responding appropriately to changes in a routine work-setting.  (Tr. 729, 731).  They also found that Meadows could lift up to twenty pounds occasionally, stand or walk for up to six hours per day, and sit for up to six hours per day.  (Tr. 732-39, 740).

Meadows improved in the chronic pain program.  She underwent a series of cervical facet injections that provided her with enough relief that her treating physician, Marvin Faulkner, D.O., was able to decrease some of her pain medications.  (Tr. 785-857).  Faulkner certified that Meadows was able to return to work without restrictions as of February 16, 2006, (Tr. 790), but two months

---

[9] A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

later, Faulkner completed a written evaluation of Meadows' functional capacity that is inconsistent

with the ability to work.  (Tr. 893, 1131-32).  Faulkner opined that Meadows could sit for a total of

thirty minutes and stand or walk for a total of thirty minutes.  He limited her to lifting or carrying

up to ten pounds, and found that Meadows' ability to use her hands for simple grasping, pushing or

pulling, and fine manipulation was impaired, as was her ability to operate foot controls.  He further

found that she could not bend, squat, crawl, climb, stoop, crouch, or kneel.   (Tr. 895).  Faulkner

stated that Meadows suffered from moderate to severe pain that would preclude or cause a marked

handicap in her ability to perform the activity that precipitated her pain.  (Tr. 896).  He opined that

she would require frequent rest periods and would probably miss work on a frequent basis due to

exacerbations of her pain, which would make her an unreliable worker.  (Tr. 897).

Meadows also saw Florence Ouseph, M.D., in 2006 for psychological evaluation.  (Tr. 779).

Meadows complained of anxiety attacks and mood swings, and also admitted having thoughts of

suicide.   Her mood and affect was depressed, but she was cooperative and showed good

comprehension of the proceedings.  Meadows demonstrated fair concentration and attention, the

ability for abstract thought, average intellect, and fair judgment and insight.  (Tr. 781).  Ouseph

diagnosed a bipolar disorder, panic disorder, and obsessive compulsive disorder, and assigned

Meadows a current GAF score of 50.  Ouseph prescribed counseling and medication.   (Tr. 782).

Meadows was referred to orthopedist Erik Wieser, M.D., in April 2006 for evaluation of her

low back pain and pain in her left lower extremity.  (Tr. 953).  After examining Meadows and

reviewing the normals results from diagnostic tests, Wiser found that surgical intervention was not

required.  He recommend that Meadows participate in a pain management program.  (Tr. 955).

On January 1, 2007, Meadows went to the hospital with complaints of chest pain, but was

-13-

admitted for inpatient psychiatric treatment after reporting suicidal thoughts. (Tr. 959-72, 990).  Her diagnoses were bipolar disorder, opiate dependence, anxiety disorder, and post-traumatic stress disorder, and she was discharged following an overnight stay.  (Tr. 959-61).

On February 7, 2007, Meadows was evaluated by Deborah Gleaves, Ph.D.  (Tr. 925). Meadows complained of depression, fits of rage, a panic disorder, and post-concussion syndrome. (Tr. 926).  After performing a mental status examination and administering intelligence tests, Gleaves diagnosed bipolar disorder, panic disorder without agoraphobia, and a pain disorder. Gleaves assessed a current GAF score of 45, and assigned a guarded prognosis.  Gleaves also opined that Meadows knew the meaning of filing for benefits, but was unable to manage her own funds. (Tr. at 931).

Gleaves completed a medical source statement regarding Meadows' ability to perform work-related mental activities.  Gleaves found no limitation in Meadows' ability to understand, remember, and carry out short, simple instructions; however, she rated Meadows as markedly limited[10] in her ability to understand, remember and carry out detailed instructions or make judgments on simple work-related decisions.  (Tr. 933).  Gleaves also found marked limitation in Meadows' ability to interact appropriately with the public, supervisors, and coworkers, and in her ability to respond appropriately to work pressures or changes in a routine work-setting.  (Tr. 934).

2.      Administrative Hearing

Meadows testified that her bipolar disorder became more severe after she hit her head.  She complained of insomnia that persists for days, hearing voices, and fits of rage.  (Tr. 1109). Medication is only partially effective.  (Tr. 1110).   She testified that she is exhausted after an

---

[10] A "marked" rating indicated that the ability was severely limited, but not precluded.  (Tr. 933).

episode of insomnia and sleeps for two or three days.  (Tr. 1111).

Meadows testified that her husband did most of the housework and cooking because she was unable to stand for long periods.  (Tr. 1113).  She had difficulty concentrating, and testified that her short-term memory was horrible.  She complained that she had lost blocks of time from her long-term memory, which was frustrating for her and her husband.  (Tr. 1115-17).  Meadows testified that she got along with others and had no difficulty being around people.

Meadows testified that she worked for three months in 2000 for a temporary employment agency, but she was terminated for absenteeism.  She testified that she was able to perform the work, but it took her longer than it should have.  (Tr. 1118).   She worked for a healthcare company in 2001, but was fired from that job also for absenteeism and being too slow.  (Tr. 1119).

Meadows explained that she used a cane when she walked because her legs sometimes gave way and caused her to fall.  (Tr. 1119).  Her physician had recommended back surgery, but she decided not to have the surgery.  Most of her pain was in her lumbar spine, neck, and shoulder.  (Tr. 1120-21).  Meadows estimated that she could sit for twenty minutes before she would need to lie down.  She estimated that she could stand for  two minutes before her legs would give way, and she could walk approximately half a block if she used her cane.  (Tr. 1122).  She asserted that she was unable to bend over, reach forward repeatedly, or reach overhead.  (Tr. 1123).  Meadows testified that she was ambidextrous.  Although she could grip and carry items with her hands, she had difficulty picking up smaller items with her fingers.  (Tr. 1124).  Meadows also testified that she was anxious and had panic attacks everyday.  (Tr. 1125).  Medication helped, but did not eliminate her anxiety.  (Tr. 1126).

Medical expert John Simonds, M.D., summarized Meadows' treatment history beginning

with her work-related injury in 1999. (Tr. 1127-36). He also noted that she had undergone extensive

psychological testing. (Tr. 1128, 1133-34). Simonds testified that Meadows would have difficulty

performing overhead reaching because of her shoulder impairment, and she would have problems

with repetitive cervical motions. He also opined that there would be some lifting limitations and

restrictions in Meadow's ability to perform repetitive wrist motions. With respect to Meadows'

mental impairments, Simonds opined that she was restricted to superficial public contact and that

her memory and concentration deficits would limit her to simple work. (Tr. 1137).

Vocational expert Shelly Eike testified that the job of computer programmer analyst was

sedentary and skilled work. (Tr. 1137). The ALJ asked Eike to consider an individual of Meadow's

age, education and work experience, with following limitations:

> [L]ift and carry occasionally ten pounds, lift and carry frequently no more than ten
> pounds, stand and walk about six hours in an eight-hour day, sit about six hours in
> an eight-hour day, with the ability to periodically alternate sitting and standing to
> relieve pain or discomfort. Push/pull limitations in the upper extremities would be
> limited to ten pounds. No climbing of ramps–no climbing of ladders, ropes, of
> scaffolds, no balancing, occasional kneeling, crouching, crawling, and stooping.
> Reaching with the left hand would be occasional, left arm would be occasional, and
> no overhead reaching [with the left arm].
> . . . .
> Frequent handling, fingering, and feeling bilaterally, frequent reaching with the right
> arm. No visual or communication limitations. No work at unprotected heights, no
> work around hazardous, moving machinery, no repetitive hand motion, no repetitive
> neck motion. Can understand, remember, and carry out short, simple instructions in
> a simple and routine work environment, only occasional public contact, could
> respond to usual work pressures appropriately in a simple and routine work
> environment, and could respond appropriately to changes in a work setting.

(Tr. 1138). Eike testified that a person with these limitations could not perform Meadows' past

relevant work, but would be capable of performing other work. Examples included office helper,

which was light and unskilled, with an estimated 52,000 jobs nationwide and 3,500 jobs in Texas;

document preparer, which was sedentary and also unskilled, with an estimated 29,000 jobs

nationwide and 2,200 jobs in Texas; and machine tender, which was a light and unskilled job, with an estimated 60,000 jobs nationwide and 3,000 jobs in Texas.  (Tr. 1139).

In response to questions from Meadows' attorney, Eike testified that employers would tolerate absenteeism not exceeding one or two days a month. She also clarified that the machine tender job required a person to remain at an assigned work station, but did not necessarily require concentration because of the automation involved.  (Tr. 1140). She further testified that a marked decrease in concentration would not affect the jobs she had named because they were simple and routine in nature.  (Tr. 1141).

3.      ALJ Decision

At the first step of the sequential evaluation process, the ALJ found that Meadows' employment in 2000 and 2001 constituted substantial gainful activity, but she had not engaged in substantial gainful activity since January 1, 2002.  He further found that Meadows had the following severe impairments: post-concussion syndrome with short-term memory loss; major depressive disorder; pain disorder, and cognitive disorder; bilateral carpal tunnel syndrome; shoulder pain post arthroscopic surgery; and lumbar degenerative disk disease.  The ALJ found that Meadows had no impairment or combination of impairments that met or equaled any listed impairment.  (Tr. 23-24).

The ALJ turned to the issue of Meadows' residual functional capacity (RFC).  He found that Meadows could perform work requiring lifting and carrying no more than ten pounds; standing and/or walking for no more than six hours in an eight-hour workday with the opportunity to alternate between sitting and standing; no pushing or pulling of more than ten pounds with her upper extremity; no climbing ladders, ropes, or scaffolds; no balancing; no more than occasional kneeling, crouching, crawling, or stooping; no more than frequent reaching, handling, fingering or feeling with the right arm and hand; no more than occasional reaching with the left arm or hand; no more than

frequent handling, fingering or feeling with the left arm and hand; no repetitive hand motion with the left arm and hand; no repetitive neck motion; no working with any hazardous machinery; no working at unprotected heights; understanding, remembering, and carrying out no more than simple instructions; making judgments in simple work-related decisions; and no more than occasional contact with the public.  The ALJ further found that Meadows was capable of responding appropriately to usual work pressures and changes in work setting.  (Tr. 24).

Based on the vocational expert's testimony, the ALJ found that Meadows was unable to perform any of her past relevant work, but she was able to perform other work existing in significant numbers in the national economy.  (Tr. 31).  Proceeding to the fifth step of the evaluation, the ALJ concluded that Meadows was not disabled for purposes of the Social Security Act.  (Tr. 32).

E.     DISCUSSION

1.     Medical Opinions

Meadows contends that the ALJ did not properly evaluate the opinions of treating and examining sources and gave too much weight to the opinions of non-examining state agency medical consultants in assessing her residual functional capacity (RFC).  She  contends that reversal is warranted because this error affects all of the remaining steps in the sequential evaluation process.

Generally, opinions, diagnoses, and medical evidence from a treating physician who is familiar with a claimant's impairments, treatments, and responses should be given great weight in determining disability.  *See  Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995);  *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  The ALJ assigns controlling weight to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). The disability

-18-

regulations also set forth factors to be considered in weighing medical opinions, which include the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. §§ 404.927(d), 416.927(d); SOCIAL SECURITY RULING 96-2p, 96-5p. Absent competing firsthand medical evidence, the ALJ must consider each of these factors before declining to give any weight to the opinions of a treating physician. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). The determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237.

Although the ALJ stated that he considered all of the opinion evidence in accordance with the regulations and rulings, Meadows complains that it is unclear what weight the ALJ gave to the treating and examining source opinions. The ALJ does not specify in his decision if he assigned controlling weight, some weight, or no weight to the treating or examining source opinions, although he asserted that he gave substantial weight to the non-examining state agency medical consultants. (Tr. 30). The regulations, rulings, and relevant case law reflect that the ALJ should weigh all of the medical source opinions and articulate the reasons underlying the decisions he has made; therefore, the ALJ erred by not fulfilling that duty in Meadows' case.

A finding of error, however, does not end the court's inquiry. The court will not disturb the Commissioner's decision unless substantial rights have been affected. *See Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). Meadows has made such a showing in her case. She concedes that there are many contradictory opinions with

respect to her diagnoses and mental abilities, but asserts that there is no material dispute among the treating and examining sources that she is impaired in her ability to interact with the public, coworkers, or supervisors, and her ability to respond appropriately to changes in work setting.  She asserts that both of these activities are required for the performance of even unskilled work.  *See generally* 20 C.F.R. §§ 404.1521(b), 416.921(b).  The ALJ limited Meadows only with respect to public contact, and contrary to the treating and examining medical opinions, found her capable of responding appropriately to work pressures and changes in a routine work setting.[11]  (Tr. 24). Meadows proposes that the RFC assessment rests either on the ALJ's faulty interpretation of the medical opinions or his rejection of those opinions without articulating good cause, and regardless of which explanation is correct, the  Commissioner's decision must be reversed.

Meadows persuasively argues that the ALJ mischaracterized what treating psychologist Brewer meant when she rated Meadows' functional capacity for several basic work activities as "fair."  The ALJ explained that Brewer, as a treating source, had identified no area of total inability or even poor mental ability; however, the forms that Brewer completed defined a "fair" ability as a substantial loss in ability so that the claimant, at best, could perform the activity  in a sheltered work setting where special accommodations are provided--not a competitive work environment. (Tr. 331). The rating of "poor" or "none" was reserved for claimants who could not perform the named activity in either regular, competitive employment or a sheltered work setting.  (Tr. 331).  The ALJ did not appreciate this distinction, and as a result, doubts arise about the basis for his assessment of Meadows' mental RFC.  The ALJ's error is also compounded by errors he made in assessing the

---

[11] The medical expert did not address Meadows' ability to handle work pressures or respond to changes in routine work setting.  The state agency medical consultants opined that Meadows retained the ability to respond appropriately to changes in work setting.  (Tr. 729, 731).

consultative examination reports.[12]  Stephenson, in particular, opined that Meadows showed marked restriction in her ability to respond appropriately to work pressures and to changes in routine work setting, yet the ALJ asserted that Stephenson assessed no areas of marked or extreme limitation.  (Tr. 29).   Stephenson's findings of marked impairment are consistent with both Brewer's earlier assessment as well as  Gleaves' findings during Meadows' more recent consultative evaluation.

There is evidence that Meadows continued to work intermittently during the relevant time period, and most of the consultative examiners reported no more than moderate levels of impairment in most aspects of Meadows' mental functioning.  Nonetheless, the ALJ's determination must stand or fall on the reasons provided in the ALJ's decision.  *Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir.2002); *Newton*, 209 F.3d at 455.  The ALJ assigned substantial weight to the state agency medical consultants and adopted the recommendations of the medical expert, but without an explanation for his decision to give greater weight to these sources over treating source opinions, the court must find that his decision is unsupported by substantial evidence.  *See Newton*, 209 F.3d at 457 (finding RFC determination unsupported by substantial evidence because ALJ relied on non-examining physician over treating specialist's opinions without explanation).

Meadows asserts that it is appropriate for the court to reverse the Commissioner's decision and enter an order awarding benefits because the Social Security Administration has had several opportunities to get it right and therefore a fully favorable decision is appropriate.   It is not clear

---

[12] Meadows also complains that the ALJ failed to acknowledge that two of the consultative examiners assessed GAF scores consistent with serious impairment.  She does not cite any authority suggesting that a particular GAF score is a determinative measure of a claimant's disability or that the score should be viewed in isolation and without regard to other evidence in the record. An ALJ's failure to reference GAF scores in assessing a claimant's RFC does not, standing alone, render the ALJ's decision inaccurate. *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002).  Moreover, the ALJ affirmed that he reviewed all of the evidence in making his determination.  (Tr. 22).  The testifying medical expert also thought the variations in GAF scores assigned by one-time examiners were too wide, suggesting they were of limited value.  (Tr. 1136).

from the administrative record  that Meadows is disabled.  She has been able to perform at least some work since her alleged onset date despite her arguments of disabling impairments, and many of the medical opinions reflect that she can perform some range of simple work.  It is the precise contours of her residual mental abilities that require further development, and only after proper consideration is given to all of the medical opinions of record can that determination be made. Because additional fact-finding is necessary, remand for an immediate award of benefits is not appropriate.

　　　　2.　　Substantial Gainful Activity

Meadows contends that the ALJ erred at the first step of the sequential evaluation process when he found that her employment after her alleged disability onset date constituted substantial gainful activity rather than unsuccessful work attempts.  Substantial work activity involves significant physical or mental activities, and work may be substantial even if performed on a part-time basis or the claimant does less, gets paid less, or has less responsibility than she had in her previous work.  20 C.F.R. §§ 404.1572(a), 416.972(a). Gainful activity is work done for pay or profit.  20 C.F.R. §§ 404.1572(b), 416.972(b). Substantial gainful activity is work activity that is both substantial and gainful.  20 C.F.R. §§ 404.1572, 416.972.

The ALJ noted that Meadows worked for less than three months in 2000, with earnings of $7,455, and she worked for three months in 2001, with earnings of $11,692.30, which were amounts far in excess of the threshold earnings level to qualify as substantial gainful activity.  (Tr. 23).  *See generally* 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2).  He rejected the argument that her jobs should be considered unsuccessful work attempts as defined in the regulations.  (Tr. 23).  The ALJ also found it persuasive that Meadows had typically worked in temporary positions as a means of her regular income.  (Tr. 23, 290).

-22-

Meadows complains that the ALJ did not specify what standard he applied in assessing whether her work qualified as substantial gainful activity. The ALJ explained that Meadows' work could not be considered an unsuccessful work attempt because it was not shown that she was forced to stop work or forced to reduce the amount of her work due to her impairment, she was reported to be capable of working during 2000 and 2001, and her earnings did not fall below the level for substantial gainful activity. (Tr. 23). The ALJ's analysis conforms to the regulations, which provide that work performed for three months or less will be treated as an unsuccessful work attempt if the claimant stopped working, or reduced her work and earnings below the level of earnings representing substantial gainful activity, because of her impairment. 20 C.F.R. §§ 404.1574(c)(3), 416.974(c)(3). *See also* SOCIAL SECURITY RULING 05-02; SOCIAL SECURITY RULING 84-25.

Meadows complains that the ALJ reached his decision at step one by using circular reasoning and assuming facts related to her ability to work that the ALJ could not decide until he addressed each of the subsequent steps of the sequential evaluation process. As proof, Meadows refers to the ALJ's comment that she had been "reported as capable of working" in 2000 and 2001. (Tr. 23). But the ALJ was not making an assumption or premature assessment of Meadows' disability. He was reciting the objective findings in treating and examining source reports that are part of the administrative record. (Tr. 23, 219, 266).

Meadows also complains that the ALJ ignored evidence that she was terminated from her job in 2001 because of absenteeism. Meadows worked as a production analyst from January 3, 2001 to April 4, 2001, but was terminated at the end of her probationary period because of excessive absences. (Tr. 400). The ALJ did not mention the employer's report, but his decision reflects that he was aware, from Meadows' own testimony, that she had been fired from both of the jobs she held after November 1999 for absenteeism and being too slow. (Tr. 25). In addition, it is not enough

-23-

that the court might be inclined to reach a different decision on this issue.  If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its judgment for the Commissioner's, even if the court determines the evidence preponderates toward a different finding.  *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir.1980). Meadows has not shown that the ALJ committed legal error  at the first step of the sequential evaluation process, and she has not demonstrated that the ALJ's determination that she engaged in substantial gainful activity in 2000 and 2001 is unsupported by substantial evidence.

RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further proceedings consistent with these proposed findings of fact and conclusions of law.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until May 29, 2009.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions

-24-

accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until May 29, 2009, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.   It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED MAY 8, 2009.


    /s/    Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE